UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :    04 CIV. 7561 (DLC)
MICHELLE GRATTON,                    :
                                         :
                  Plaintiff,      :
                                         :    OPINION AND ORDER
     -v-                                :
                                         :
JETBLUE AIRWAYS,                     :
                                         :
                  Defendant.      :
                                         :
----------------------------------------X

Appearances:

For plaintiff Michelle Gratton:
Rachel S. Rothschild
Ballon Stoll Bader & Nadler, P.C.
1450 Broadway, 14th Floor
New York, NY 10018

For defendant JetBlue Airways Corp.:
Ana S. Salper
Krupin O'Brien LLC
1156 Fifteenth Street, N.W.
Washington, D.C. 20005

DENISE COTE, District Judge:

     Plaintiff Michelle Gratton ("Gratton") brings this action
alleging violations of Title VII of the Civil Rights Act of 1964
("Title VII"), 42 U.S.C. § 2000e-2(a), and the Pregnancy
Discrimination Act of 1978 ("PDA"), 42 U.S.C. § 2000e(k).
Specifically, Gratton alleges that she suffered disparate
treatment and a hostile work environment on the basis of her
pregnancy and that she was terminated in retaliation for
requesting that her employer accommodate her condition and
complaining about discrimination.

On February 2, 2005, defendant JetBlue Airways Corporation ("JetBlue") moved to dismiss the claims against it pursuant to Rule 12(b)(6), Fed. R. Civ. P., on the grounds that plaintiff has failed to state a claim upon which relief can be granted. JetBlue also moves, in the alternative, to strike all allegations in Gratton's third amended complaint "relating to [JetBlue]'s failure to accommodate" her and for sanctions due to Gratton's "clear abuse of the judicial process by repeatedly failing to bring colorable claims." For the reasons stated herein, JetBlue's motion to dismiss is granted in part and denied in part, and its motions to strike and for sanctions are denied.

## Background

The following facts are taken from Gratton's third amended complaint. In February 2001, Gratton, who is now thirty-five years old, was hired by JetBlue to work as a part-time customer service employee in its Burlington, Vermont facility. After Gratton received training as a ramp agent, she worked in this capacity until January 2002. At that time, Gratton received training to work as an "above the wing" customer agent, which entails checking in customers, assisting with baggage claims, staffing gates and reservation counters, and preparing for future flights. Gratton's duties as an "above the wing" agent were performed "at the counter."

On July 29, 2003, Gratton was transferred to JetBlue's

Tampa, Florida facility to work as "part-time customer service crew." In transferring Gratton to Tampa, JetBlue asked her to perform the responsibilities of a "cross-trained employee," which include "working as a customer service agent at the check-in counter and at the gate, as well as working as a ramp agent loading and off loading baggage on the planes." On August 12, Gratton fainted while running during her non-work hours. Three days later, she took a pregnancy test and learned that she was pregnant.

On August 16, Gratton notified her supervisor, William Thro ("Thro"), that she was pregnant and requested that she be able to work "exclusively above the wing" for the remainder of her pregnancy. Having fainted days earlier, Gratton feared that working on the ramp, which is below the wing of the aircraft and where the temperature "often exceed[s] ninety-five degrees," could cause her to faint again. Thro told Gratton that she could work above the wing for the remainder of that week but that after August 23, she would have to "take disability leave for the remainder of her pregnancy if she refused to work on the ramp." Gratton objected to this on the ground that forcing her to work on the ramp "endangered her health" and met with Thro the next day to discuss her concerns.

On August 17, Thro and Gratton met again, at which time Gratton asked Thro to place her in a counter position similar to the one she held in Burlington. Thro refused and reiterated that

if plaintiff did not agree to work on the ramp, "she would have to take disability leave." Thro also expressed to Gratton that "she would not be able to work with [JetBlue] in Florida if she was unable to work on the ramp." Thro then encouraged Gratton, a former nurse, to search for employment in nursing. At no point in this conversation, however, did Gratton assert, much less suggest, a desire to leave the airline industry or to revive her career in nursing.

On August 18, Gratton sent an email to Barbara Shea ("Shea"), JetBlue's director of human resources; Santo Barravecchio; and the Bluebenefits department, which is responsible for insurance benefits, requesting "a meeting to discuss the discriminatory and retaliatory conduct she was experiencing at JetBlue on the basis of her gender and pregnancy status." Gratton received a response to her email on August 26 from Diedra Harris ("Harris"), the Northeast manager of human resources. In their August 26 conversation, Harris informed Gratton that Thro "did not have the right to send plaintiff home on disability during her pregnancy." Harris also conveyed to Gratton that she would investigate Gratton's complaints further by talking with Michael Cashier ("Cashier"), the manager of BlueCities JetBlue, and Thro. Most significantly, Harris "assured plaintiff that her job with [JetBlue] was not in jeopardy due to her pregnancy."

Approximately three days later, Harris and Gratton spoke

again.  Gratton explained to Harris that Thro required her to furnish him with "a doctor's note to explain [her] work limitations during pregnancy."  Gratton also told Harris that Thro refused to allow Gratton to switch shifts with other Tampa employees so as to minimize or eliminate her work on the ramp and obtain solely "above the wing" work.[1]

On August 30, the day after Gratton's second conversation with Harris, Thro "reprimanded" Gratton for complaining about his conduct.  Gratton then asked Thro "if she could make arrangements with other employees to cover her work on the ramp" in exchange for her performing their "above the wing" shifts.  Thro refused.  According to Gratton, JetBlue allows "almost all of its Florida crewmembers to trade their shifts," requiring only that crewmembers complete a shift trade form and submit it to a supervisor.  Thro also demanded that Gratton "produce a doctor's note indicating that she was fit to work on the ramp during her pregnancy."  Gratton alleges that JetBlue does not and has not required non-pregnant employees to provide such a note from their respective physicians.  So as "to maintain her job" with JetBlue, Gratton "reluctantly agreed" to work on the ramp while pregnant.

On August 31, Thro told Gratton that JetBlue was

---

[1] In her third amended complaint, Gratton alleges that Thro demanded a doctor's note and refused to allow her to swap shifts with other employees during an August 30 conversation.  It is unclear how Gratton could have complained about these actions in her August 29 conversation with Gratton unless the dates she has provided are in error or Thro merely reiterated himself on August 30.

contemplating adopting a "soft work" program, "which would enable [Gratton] to remain working on light duty during her pregnancy." He reminded, her, however, that if such a program were not implemented, "she should be prepared to be put on leave immediately."  Gratton reported this conversation, as well as other details of Thro's "harassing, discriminatory, and retaliatory treatment" of her, to Harris on September 5.  Harris responded that Cashier and Judy Zimmer ("Zimmer"), director of BlueCities JetBlue, had plans to visit the Tampa facility to "further investigate" Gratton's complaints.  Harris then instructed Gratton "to take a few days off" while the on-the-ground investigation took place.

On September 8, Gratton "stopped working" at JetBlue's Tampa facility and "waited to hear whether [JetBlue] would reasonably accommodate her before returning to work."  The next day, she returned to Vermont "in an effort to resume her employment with [JetBlue]."  Approximately one week later, Gratton spoke with Linda Daire ("Daire"), JetBlue's Southeast manager of human resources, and inquired whether there had been any progress regarding the "soft work" program Thro had mentioned to her. Daire notified Gratton that it did not have any "soft work" available.  She also reiterated Thro's request that Gratton provide JetBlue with a "medical note stating any limitations plaintiff might have during her pregnancy."

Ten days later, on September 18, Gratton visited her

gynecologist, Dr. Tracy Maurer, M.D. ("Maurer"), and initiated a conversation with Maurer about her ability to work at JetBlue for the duration of her pregnancy. Maurer responded that Gratton could continue to work for JetBlue with two "minor restrictions:" during her pregnancy, Gratton could not work in any heat exceeding her "natural body temperature of ninety-eight degrees" and could not lift objects heavier than twenty-five to thirty pounds. Maurer clarified to Gratton that these restrictions were not unique to her but were "the regular restrictions imposed on any non-high-risk pregnant women." Maurer then wrote a note to JetBlue to this effect.

The next day, September 19, Gratton and Daire had a telephone conversation regarding the status of Gratton's employment with JetBlue, during which Gratton read Maurer's note to Daire. Gratton asked Daire if she needed a copy of this note, to which Daire answered in the negative. Daire also told Gratton that Thro had reported that Gratton had resigned from JetBlue. Gratton explained to Daire that she never told Thro that she was resigning nor did she have any intention to resign. Rather, Gratton was waiting for Daire to let her know whether JetBlue could "reasonably accommodate" her pregnancy. Gratton then notified Daire that she was willing to return to the Vermont facility to "resume her previous position."[2]

---

[2] Gratton's third amended complaint indicates that Harris had previously suggested this option to her but does not communicate when such recommendation was made.

In October 2003, Gratton met in Vermont with Daire; Harris; Susan Gorski ("Gorski"), JetBlue's director of human resources; and Ann Beland ("Beland"), general manager of the Vermont facility; to discuss Gratton's status as an employee of JetBlue. During the meeting, JetBlue told Gratton that "they were having a difficult time reasonably accommodating her because of the restrictions imposed by Dr. Maurer," especially since the restrictions "prevented [JetBlue] from permitting [Gratton] to work during the day shift," which runs from 5:00 a.m. to 5:00 p.m. Gratton then suggested that she be restored to the counter position she had held previously for the remainder of her pregnancy. JetBlue, however, did not "restore [Gratton] to any position" after this meeting, "thereby leaving [her] out of work and wondering when, if ever, defendant was going to reasonably accommodate her."

Gratton did not hear from JetBlue again until the last week of November 2003, at which time Beland "notified [Gratton] that she would later notify her about [her] work schedule." Beland and Gratton spoke again on December 1, 2003, and Beland offered Gratton the opportunity to work thirty additional days with JetBlue, after which she would be required to take medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., until after she gave birth. Despite telling Gratton that her medical condition prevented them from allowing her to work a day shift, the schedule Beland offered Gratton included

three afternoon shifts of 2 p.m. to 5 p.m., one evening shift of 10 p.m. to 2 a.m., and one full day shift of 10:00 a.m. to 5:00 p.m. per week. Feeling as if she had "no other choice," Gratton accepted this offer on December 2, 2003.

Gratton then waited to hear from JetBlue as to when she could report to work and did not hear from any JetBlue employee until December 18, when Beland notified her that JetBlue could no longer offer her the schedule they discussed on December 1. Beland and Gratton did not communicate again until January 2, 2004, at which point Gratton reiterated her desire to work the thirty day period previously offered. Beland then told Gratton that she would provide her with a schedule at a later date.

On January 5, 2004, Beland offered Gratton a new schedule that involved three afternoon shifts, three evening shifts, and one Saturday afternoon shift. Again, the proposed schedule contradicted JetBlue's earlier statement that they could not allow Gratton to work during the hours of 5:00 a.m. to 5:00 p.m. JetBlue informed Gratton that the evening shifts, which involve cleaning the aircraft, would encompass "light duty" work.

Concerned about whether cleaning the aircraft would be a danger to her health or that of her fetus, Gratton contacted Maurer. Maurer informed Gratton that cleaning the aircraft was, as Gratton suspected, not healthy for her during her pregnancy and "strongly suggested that [Gratton] not accept this position while pregnant." As a result, on January 9, Gratton refused the

schedule proposed by Beland during their January 5 conversation.
Beland then informed Gratton that JetBlue had no shifts for her
at its Vermont facility other than evening shifts. "During that
same time," however, Beland sent an email to other JetBlue
employees in Vermont, including Jeff Nichelson, a supervisor,
informing them that there were "numerous non-late-night hours"
that needed to be staffed.

On February 2, Gratton participated in a conference call
with Beland, Daire, and Gorski. During this call, Beland told
Gratton that if she didn't work thirty days of the "soft work"
night shift, she would not be able to return to work until six
weeks after the birth of her child. As a result, Gratton did not
return to work despite the fact that she "was able to perform the
major functions of her job throughout her pregnancy with a
reasonable accommodation." Gratton alleges that JetBlue has
"engaged in such discriminatory, retaliatory, and harassing
conduct" against at least two other pregnant employees, Angela
Hawthorne and Audra "Doe," both of whom were forced to stop work
during their pregnancies because they were unable to work on the
ramp.

On March 19, 2004, Gratton filed a complaint with the Equal
Employment Opportunity Commission ("EEOC") in which she
complained that JetBlue subjected her to employment
discrimination because of her "disability (Pregnancy) and gender
(female) in violation of the Americans with Disabilities Act of

1990, as amended, and Title VII of the Civil Rights Act of 1964, as amended, and all applicable New York State Law." Gratton received her right-to-sue letter from the EEOC on June 25, and she instigated this action on September 23. On October 19, Gratton received a letter from the JetBlue Airways Retirement Plan notifying her that she had been terminated from service with JetBlue. Gratton understands this letter to be an official notice of her termination of employment by JetBlue.

In her initial complaint, Gratton alleged that JetBlue had discriminated against her and harassed her on the basis of her gender and her disability in violation of Title VII and the ADA, respectively. On October 18, Gratton amended her complaint to include claims for relief under the Florida Civil Rights Act of 1992 ("FRCA"). After JetBlue filed a motion to dismiss on November 22, the parties agreed, through a December 14 stipulation, that Gratton would file a second amended complaint detailing claims for discrimination and harassment premised on the PDA, that she would withdraw her other claims, and that JetBlue would withdraw its motion to dismiss.

Gratton filed her second amended complaint on January 12, 2005, and JetBlue moved to dismiss on February 2. A pretrial conference was held in this case on March 11, at which Gratton represented that she wanted to further amend her complaint. Gratton's request for leave to amend was granted, but she was told that this would be her final opportunity to amend. Gratton

filed her third amended complaint that day, and on March 22, the
parties stipulated to the sole change in the third amended
complaint, the addition of a paragraph regarding JetBlue's
October 19, 2004 letter to Gratton.

## Discussion

Rule 8(a) requires that the plaintiff provide a "short and
plain statement of the claim showing that the pleader is entitled
to relief."  Rule 8(a), Fed. R. Civ. P.  Pleadings are to give
"fair notice" of a claim and "the grounds upon which it rests" in
order to enable the opposing party to answer and prepare for
trial, and to identify the nature of the case.  <u>Dura Pharm., Inc.</u>
<u>v. Broudo</u>, 544 U.S. ___ , No. 03-932, slip. op. at 9 (2005)
(citation omitted); <u>see also</u> <u>Swierkiewicz v. Sorema, N.A.</u>, 534
U.S. 506, 512 (2002).  Rule 8 is "not meant to impose a great
burden upon a plaintiff."  <u>Broudo</u>, slip op. at 10.  Indeed,
because Rule 8 is fashioned in the interest of fair and
reasonable notice, not technicality, "extensive pleading of facts
is not required."  <u>Wynder v. McMahon</u>, 360 F.3d 73, 77 (2d Cir.
2004) (citation omitted).  With respect to complaints of
employment discrimination, such pleadings need not "contain
specific facts establishing a prima facie case of discrimination"
in order to survive a motion to dismiss.  <u>Swierkiewicz</u>, 534 U.S.
at 508 (citation omitted).

To dismiss an action pursuant to Rule 12(b)(6), a court must

determine that "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." Scutti Enters., LLC v. Park Place Entm't Corp., 322 F.3d 211, 214 (2d Cir. 2003) (citation omitted). In construing the complaint, the court must "accept[] as true the factual allegations in the complaint as true and draw[] all inferences in the plaintiff's favor." Id. If it is clear, however, that "no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint should be dismissed. Swierkiewicz, 534 U.S. at 514.

I.  Disparate Treatment

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In 1978, Congress enacted the PDA to "ma[k]e clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." Automobile Workers v. Johnson Controls, 499 U.S. 187, 199 (1991) (citation omitted). Specifically, the PDA provides that

the terms "because of sex" or "on the basis of sex"

include, but are not limited to, because of or on the
basis of pregnancy, childbirth, or related medical
conditions; and <u>women affected by pregnancy,
childbirth, or related medical conditions shall be
treated the same for all employment-related purposes</u>,
including receipt of benefits under fringe benefit
programs, <u>as other persons not so affected but similar
in their ability or inability to work</u>.

42 U.S.C. § 2000e(k) (emphasis supplied).

In 1979, the EEOC promulgated regulations under the PDA, one

of which specifies that

> Written or unwritten employment policies and practices
> involving matters such as the commencement and duration
> of leave, the availability of extensions, the accrual
> of seniority and other benefits and privileges,
> reinstatement, and payment under any health or
> disability insurance or sick leave plan, formal or
> informal, <u>shall be applied to disability due to
> pregnancy, childbirth, or related medical conditions on
> the same terms and conditions as they are applied to
> other disabilities.</u>

29 C.F.R. § 1604.10 (emphasis supplied).  To provide employers

with guidance as to implementing the PDA and the accompanying

regulations, the EEOC published an appendix, in which it declares

that "[a]n employer may not single out pregnancy-related

conditions for special procedures for determining an employee's

ability to work."  Questions and Answers on the Pregnancy

Discrimination Act, 29 C.F.R. pt. 1604, App.  Nor may an

employer, according to the appendix, "have a rule which prohibits

an employee from returning to work for a predetermined length of

time after childbirth."  <u>Id.</u>  Where, however, an employee is

"temporarily unable to perform the functions of her job because

of her pregnancy-related condition," the EEOC's guidance explains that her employer does not necessarily need to provide her with an alternative job. Id. Rather, an employer's obligation under the PDA is to treat her "in the same manner as it treats other temporarily disabled employees, whether by providing modified tasks, alternative assignments, disability leaves, leaves without pay, etc." Id.

Several circuits have echoed the EEOC's understanding of the PDA as one that does not legislate fairness, but instead requires parity between employers' treatment of pregnancy-related disabilities and other temporary disabilities. For instance, in Troupe v. May Department Stores Co., 20 F.3d 734 (7th Cir. 1994), the Seventh Circuit observed that the PDA does not mandate that employers "take . . . steps to make it easier for pregnant women to work" and that employers may even "treat pregnant women as badly as they treat similarly affected but nonpregnant employees." Id. at 738; see also In re Carnegie Center Assoc., 129 F.3d 290, 295 (3d Cir. 1997). Yet the Troupe court acknowledged that while the plaintiff's employer need not overlook her frequent absence from work, it would not be permissible for an employer to penalize a pregnant employee for such absences while "overlook[ing] the comparable absences of nonpregnant employees -- in which event it would not be ignoring pregnancy after all." Troupe, 20 F.3d at 738 (citation omitted); see also Armindo v. Padlocker, Inc., 209 F.3d 1319, 1322 (11th

15

Cir. 2000).

Similarly, in Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308 (11th Cir. 1994), the Eleventh Circuit determined that the PDA "does not constitute a requirement that an employer make alternative work available." Id. at 1316. While emphasizing that the PDA "does not address the right of a pregnant employee . . . to receive benefits that are different from, and arguably superior to, the benefits available to other employees," the Armstrong court nevertheless reiterated that "[p]regnant women who are able to work must be permitted to work on the same conditions as other employees." Id. (citation omitted). Moreover, when employees cannot work due to pregnancy-induced disability, "they must be accorded the same rights, leave privileges and other benefits, as other workers who are disabled from working." Id. (citation omitted).

Therefore, as a general matter, the PDA "does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees." Id. at 1317. Nor does the plain text of the PDA "compel[] an employer to prefer for alternative employment an employee who, because of pregnancy, is unable to perform her full range of duties." Fields v. Bolger, 723 F.2d 1216, 1220 (6th Cir. 1984). Yet, to the extent that an employer either provides, or has a policy of providing, a reasonable accommodation to a non-pregnant employee whose pregnant counterpart is "similar in [her] ability or

inability to work," 42 U.S.C. § 2000e(k), the employer must also reasonably accommodate the pregnant employee.  See Deneen v. Northwest Airlines, Inc., 132 F.3d 431, 437 (8th Cir. 1998) (employers "must treat pregnant women as well as they treat similarly affected employees").  In this way, pregnancy discrimination claims, like other variants of Title VII claims, are extraordinarily fact intensive, necessitating factual determinations of how similarly-situated employees were treated as well as who constitutes such similarly-situated employees.

In the instant case, JetBlue asserts that Gratton's "blatant confusion of the issues" and "lack of comprehension of the law" necessitate a dismissal of her claims.  Specifically, JetBlue contends that Gratton has failed to establish a prima facie case of discrimination as she alleges neither that she suffered any adverse employment action nor that similarly-situated, non-pregnant employees received more favorable treatment than she did.  JetBlue further argues that as the PDA requires employers to furnish pregnant employees with special accommodations only where they have done so for other employees who are "similar in their ability or inability to work," Gratton's failure to allege that "JetBlue treated employees with temporary disabilities more favorably than Plaintiff with her self-imposed work restriction" is fatal.

With respect to whether Gratton's claims must be dismissed for failure to state a prima facie case, both parties

misunderstand the law.  In <u>Swierkiewicz</u>, the Supreme Court
clarified that the prima facie case under <u>McDonnell Douglas Corp.
v. Green</u>, 411 U.S. 792 (1973), "is an evidentiary standard, not a
pleading requirement."  <u>Swierkiewicz</u>, 534 U.S. at 510.
Concluding that an "employment discrimination plaintiff need not
plead a prima facie case of discrimination," <u>id.</u> at 515, the
<u>Swierkiewicz</u> Court observed that to hold otherwise not only would
"narrowly constrict the role of the pleadings," but also would be
inappropriate in certain cases, such as where a plaintiff,
following discovery, may "produce direct evidence of
discrimination."  <u>Id.</u> at 511 (citation omitted).  Additionally,
the Court explained that to require more from an employment
discrimination complaint than that it "give the defendant fair
notice of what the plaintiff's claim is and the grounds upon
which it rests" would thwart the plain meaning of Rule 8.  <u>Id.</u> at
512 (citation omitted).

Whether or not Gratton has correctly defined which employees
are similarly situated to her in their ability or inability to
work is a question of fact that is not appropriately resolved on
a motion to dismiss.  <u>See</u> <u>Mandell v. County of Suffolk</u>, 316 F.3d
368, 379 (2d Cir. 2003).  Instead, the central inquiry facing
this Court is whether Gratton has given JetBlue fair notice of
her claim and the grounds upon which it rests.  Gratton's
complaint alleges that Thro retributively denied her an
opportunity to switch shifts with other employees, a benefit

bestowed not only on those with disabling conditions but upon almost all of JetBlue's Florida workforce. Gratton also alleges that both Thro and Daire demanded that she provide a physician's note certifying her fitness to work on the ramp but did not require such notes from any other employees; that Beland denied her the opportunity to work non-evening hours at its Vermont facility while advertising such opportunities to its other non-pregnant employees via e-mail; and that JetBlue unlawfully terminated her after she rejected their offer of thirty days of evening shift work followed by mandatory leave until after she gave birth. Such allegations are sufficient to give JetBlue fair notice of Gratton's claim and the grounds upon which they rest. As a result, JetBlue's motion to dismiss Gratton's disparate treatment claim is denied.

II. Hostile Work Environment

In addition to alleging that JetBlue discriminated against her, Gratton also alleges that she endured pregnancy-related harassment at JetBlue and that JetBlue "created an abusive working environment" in violation of the PDA. Unlike claims of discrimination based on disparate treatment or retaliation, a hostile work environment claim is "based on the cumulative effect of individual acts." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002). Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive
working environment." Id. at 116 (citation omitted).

Hostile work environment claims must meet both an objective
and a subjective standard. Not only must the victim herself
"subjectively perceive [the] environment to be abusive," but the
misconduct of which a plaintiff complains also must be "severe or
pervasive enough to create an objectively hostile or abusive work
environment." Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d
Cir. 2004) (citation omitted). As a general matter, the conduct
of which a plaintiff complains "must be sufficiently continuous
and concerted in order to be deemed pervasive." Feingold v. New
York, 366 F.3d 138, 150 (2d Cir. 2004). "Isolated acts, unless
very serious, do not meet the threshold of severity or
pervasiveness." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir.
2002). To succeed on a claim of sex-based harassment premised on
a hostile work environment, a plaintiff must also show that "a
specific basis exists for imputing the conduct that created the
hostile environment to the employer." Petrosino, 385 F.3d at 221
(citation omitted).

Gratton alleges that Thro harassed her by requiring her to
provide him with a doctor's note explaining her limitations while
pregnant and by "reprimanding her for complaining" to Harris
about his treatment of her. Gratton further alleges that Daire
also contributed to an "abusive work environment" by asking

Gratton to provide the same sort of medical note Thro previously requested.  Although Gratton may have perceived her environment to be abusive, no relief for a hostile work environment claim "could be granted under any set of facts that could be proved consistent with [her] allegations." <u>Swierkiewicz</u>, 534 U.S. at 514.  Although the Second Circuit has "repeatedly cautioned against setting the bar too high," the behavior that Gratton alleges constituted harassment was not "of such quality or quantity that a reasonable employee would find the conditions of her employment <u>altered for the worse</u>." <u>Feingold</u>, 385 F.3d at 138 (emphasis in original).  Because Gratton's complaint does not give JetBlue fair notice of the grounds upon which her hostile work environment claim rests, JetBlue's motion to dismiss Gratton's hostile work environment claim is granted.

## III. Retaliation

Title VII forbids discrimination against an applicant for employment "because [s]he has opposed any practice made an unlawful employment practice . . . or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the auspices of that statute.  42 U.S.C. § 2000e-3(a).  For a plaintiff's conduct to constitute participation in a protected activity, it is enough that he has made "informal protests of discrimination, including making complaints to management." <u>Gregory v. Daly</u>, 243 F.3d 687,

700-01 (2d Cir. 2001) (citation omitted).  Moreover, "an
employment practice need not actually violate Title VII for the
protected activities element of a retaliation claim to be
satisfied.  The plaintiff is only required to have had a <u>good
faith, reasonable belief</u> that he was opposing an employment
practice made unlawful by Title VII."  <u>McMenemy</u>, 241 F.3d at 285
(emphasis supplied.)  Whether a plaintiff's belief is reasonable
must be "assessed in light of the totality of the circumstances."
<u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276,
292 (2d Cir. 1998).

JetBlue objects that notification and requests for
accommodation of one's pregnancy do not constitute protected
activities as defined by Title VII.  JetBlue further contends
that Gratton's retaliation claim must be dismissed for non-
exhaustion because her EEOC complaint did not include a
retaliation claim nor did it refer to her having engaged in
protected activity.  JetBlue is incorrect on both accounts.

Gratton alleges that beginning on August 18, 2003, she
complained of JetBlue's "discriminatory" conduct.  This
allegation gives the defendant fair notice of the protected
activity in which Gratton alleges she engaged.  As to JetBlue's
contention that Gratton's claim must be dismissed for failure to
exhaust, it is true that a plaintiff must generally exhaust her
administrative remedies by filing a timely EEOC charge before
filing a complaint in federal court.  <u>Deravin v. Kerik</u>, 335 F.3d

195, 200 (2d Cir. 2003). The Second Circuit, however, allows "claims that were not asserted before the EEOC [to] be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency." Id. (citation omitted). A claim is reasonably related to those brought before the EEOC "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Id. (citation omitted). So too is a claim "alleging retaliation by an employer against an employee for filing an EEOC charge." Id. (citation omitted). Under either of these standards, Gratton's claim of retaliation is reasonably related to her March 19, 2004 EEOC charge, which alleged that JetBlue had discriminated against her because of her disability and gender in violation of the ADA and Title VII and contained, as an attachment, an eight-page recitation of the facts supporting her claims. Therefore, JetBlue's motion to dismiss Gratton's retaliation claim is denied.

## Conclusion

For the reasons stated above, JetBlue's motion to dismiss is denied as to Gratton's claims of disparate treatment and retaliation and is granted with respect to her hostile work environment claim. In addition, because Gratton may be able to show that JetBlue reasonably accommodated non-pregnant employees

"similar in their ability or inability to work," 42 U.S.C. §
2000e(k), JetBlue's motion to strike all references to its duty
to accommodate Gratton and its motion for sanctions are both
denied.

SO ORDERED:
Dated:     New York, New York
           May 25, 2005

                                    _Denise Cote_

                                 DENISE COTE
                            United States District Judge