UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :    04 CIV. 7561 (DLC)
MICHELLE GRATTON,                       :
                                        :
                    Plaintiff,          :
                                        :        OPINION AND ORDER
         -v-                            :
                                        :
JETBLUE AIRWAYS,                        :
                                        :
                    Defendant.          :
                                        :
----------------------------------------X

Appearances:

For plaintiff Michelle Gratton:
Rachel S. Rothschild
Ballon Stoll Bader & Nadler, P.C.
1450 Broadway, 14th Floor
New York, NY 10018

For defendant JetBlue Airways Corp.:
Ana S. Salper
Krupin O'Brien LLC
1156 Fifteenth Street, N.W.
Washington, D.C. 20005


DENISE COTE, District Judge:

     Plaintiff Michelle Gratton ("Gratton") complains that

JetBlue Airways ("JetBlue") fired her because of her pregnancy.

For the following reasons, JetBlue's motion for summary judgment

is granted.


                          Background

     The plaintiff discovered she was pregnant in August 2003,

and immediately informed her employer JetBlue.  The plaintiff

contends that JetBlue terminated her employment in February 2004,

when it forced her to take extended leave after engaging in a
"phony attempt" to place her in a soft-work program.  Believing
that her employment had been terminated, she did not contact
JetBlue or return to work following the birth of her child in
April, she applied for unemployment insurance, and she filed
claims of discrimination with the EEOC.  She asserts that JetBlue
engaged in retaliatory conduct when it sent her a notice in
October 2004 advising her about pension benefits.  The following
facts, drawn from the record the parties have presented on
summary judgment, are undisputed or taken in the light most
favorable to the plaintiff, unless otherwise indicated.

Gratton Joins JetBlue in Vermont; Job Descriptions

     Gratton was hired in Burlington, Vermont in February 2001,
as a part-time Ground Operations employee ("GO"), which is also
known as a below-the-wing or ramp employee or customer service
crewmember ("CSC").  A GO cleans the aircraft, loads and unloads
the cargo compartment of the aircraft, transports bags to and
from the aircraft and the baggage claim area, drives the tugs to
marshal in the aircraft, monitors ground equipment to make sure
it is safe and reliable, and performs aircraft security checks.

     There is a second CSC position, known as an airport
operations ("AO") or above-the-wing employee.  In January 2002,
Gratton was cross-trained to perform both GO and AO duties.   An
AO's duties during daytime shifts include checking-in customers

at a ticket counter, handling bags, working at the gate, and driving the jetbridge. At night, an AO drives the jetbridge, assists passengers leaving the plane, responds to passenger complaints, takes baggage claims, and cleans the aircraft.

Pursuant to written policy and as a requirement of hiring, both AOs and GOs were required to be able to lift up to 100 pounds.[1] Gratton was required to and did lift luggage when working as a AO and a GO.

Shifts at JetBlue are assigned to CSCs through a seniority bidding system. There can be several months between bidding opportunities. If an employee arrives at a station after a bidding period, the employee is assigned to a schedule until the next bidding opportunity.

Gratton Moves to Tampa and Learns of Her Pregnancy

In July 2003, Gratton asked to transfer to the Tampa station as a part-time CSC. The transfer was granted on the understanding that she would work as a cross-utilized CSC, working as both a GO and AO. The Tampa station, where Gratton worked from July to September 2003, had not fully adopted cross-utilization until March 2003. CSCs who joined the Tampa station after September 2001, however, were hired with the understanding that cross-utilization was part of their employment. When

───────────────

[1] Gratton's response to the defendant's Rule 56.1 Statement admits that GO's responsibilities include lifting up to 75 to 100 pounds, and that AO's responsibilities include lifting bags.

Gratton arrived at the Tampa Station in July 2003, it was between bidding periods. The next bid was to be held in September 2003.

On August 12, 2003, Gratton discovered she was pregnant when she fainted while running. Gratton told William Thro ("Thro"), the General Manager of the station, that she was pregnant and wanted to work exclusively as an AO.[2] She was concerned that working on the ramp in the Florida heat would endanger her health and pose a danger to others if she fainted. Thro responded that he could temporarily schedule her to work at the ticket counter for the remainder of the week, but that if she could not perform her duties as a GO or cross-utilized CSC that she would have to take disability or extended leave.

The plaintiff has offered no evidence that any other temporarily disabled employee at the Tampa Station was treated any differently. For instance, the plaintiff has offered no evidence that the Tampa Station had any CSC at that time who suffered from a temporary disability and who was permitted to work exclusively as an AO or GO. Three CSCs at the Tampa Station had previously been pregnant. One asked to and took disability leave. After another woman learned that her physician did not want her working outside, she took disability leave. The third did not advise JetBlue that there were any restrictions imposed

---

[2] While Gratton now contends that she did not necessarily ask to work as an AO for the entirety of her pregnancy, her complaint asserts that she "requested that she work exclusively above the wing during her pregnancy."

4

on her while she worked.  In addition, as of September 2003, only two CSCs at the Tampa station were exempt from working cross-utilization schedules.  Each of them had been hired prior to September 2001, the date at which cross-utilization was implemented at Jet Blue.

On August 18, Gratton contacted the personnel office at JetBlue, which is known as the People Department.  She spoke to Deirdre Harris, who in turn called Thro.  Thro explained to Harris that the Tampa station was cross-utilized and that he could not allow Gratton to be an exception to that policy and work solely as an AO.  Harris advised Gratton of Thro's position.

Gratton then asked that she be permitted to swap her ramp shifts for AO shifts.  According to JetBlue's written policy, CSCs were permitted to swap scheduled shifts on occasion if they had the approval of management.  They were not permitted to swap schedules either on a permanent basis or for an extended period of time.  Cross-trained CSCs were not permitted to swap shifts to get a schedule to work exclusively as an AO or GO.  The plaintiff has offered no evidence of any exception at the Tampa station to this written policy.


Gratton Returns to Vermont

On September 9, as Gratton's complaints about her situation in Tampa were being investigated, Gratton decided to return to Burlington, Vermont, and pursue returning to work for JetBlue

5

there.  On September 15, Linda Daire from the People Department advised Gratton that JetBlue was developing a soft-work program for CSCs with work restrictions.  Even though the program was not yet in place, she offered Gratton the opportunity to work a 30-day shift and thereafter take leave.

On September 18, Gratton's doctor advised Gratton that she should not lift over 25 pounds or work in heat of over 100°. Gratton had an expected delivery date in April.  The doctor recorded her instructions in a note.  Gratton met with JetBlue personnel in the Vermont station in early October, and advised them of the restrictions on lifting.  JetBlue advised Gratton that it would consider the possibility of a 30-day schedule given these restrictions, and get back to her.

On December 2, JetBlue offered Gratton a 30-day light duty schedule that required her to work 30 consecutive days.  Gratton requested instead that she be allowed to take off the seven days from Christmas to New Year's Day.  JetBlue responded that it would call Gratton after the holidays with another proposal for a 30-day schedule.

In January 2004, JetBlue offered Gratton a second 30-day schedule to begin the first week of January 2004.  It included some afternoon shifts and some late night shifts that involved cleaning the aircraft, but did not require any heavy lifting. Gratton did not accept the proposal, asking instead if she could decrease the night hours.  Gratton's January 6 email explained

that she had been sick because she had worked too many hours at her other job and was "rundown with exhaustion." She added that she had "a hard time remembering that I am 6 ½ months along and need to take it slower than my usual excessive speed," and expressed concern because the proffered schedule would have her working over 50 hours a week when combined with the more than 25 hours she was already working. When Gratton was told that she could only reduce the afternoon hours, she rejected the schedule.

Gratton has offered no evidence that the Vermont station had offered a 30-day light duty schedule to any other CSC as of that time. There is no evidence that a temporarily disabled CSC was ever permitted to work exclusively at the ticket counter at the Vermont Station.

In a letter of January 13 to Gratton, JetBlue memorialized Gratton's refusal of the January 30-day schedule, and asked her to contact the General Manager of the Vermont Station, Ann Beland, to "discuss the next step". Gratton met with Beland on February 2. Gratton contends that Beland told her to "report back to work six weeks after the birth of [her] child and to fill out the FMLA family work paperwork." She asserts that she was told that when she returned to work she would have to work whatever shift was available until the next bidding cycle, which was expected to be during the holiday period in 2004.

Prior to 2004, JetBlue did not have a formal light duty policy for CSCs injured off the job. Before that time, CSCs

could work up to 30 days in a "light duty" role.  Pregnant CSCs and any CSC who was temporarily disabled could work as long as they could perform all of the job functions.  When a CSC was no longer able to perform all regular job functions, the CSC would have to take disability leave, or other extended leave, until they could return to work without restrictions.

In 2004, JetBlue instituted a transitional duty program. Each station could identify what areas and positions it had available for light duty so long as it was a position that no CSC was actually holding at the time.  The plaintiff disputes that the Vermont Station implemented such a program in 2004.

Post-Employment Events

On March 14, 2004, Gratton filed an administrative charge with the EEOC and the New York State Division of Human Rights. She asserted that JetBlue had discriminated against her based on her pregnancy and her gender.

JetBlue's benefits coordinator informed Gratton on March 18 that it had received her FMLA form for her leave of absence, but needed an official stamp from the attending physician's office or a letter with the doctor's letterhead.  Gratton has not offered evidence that she complied with this request.

Gratton gave birth on April 17.  After giving birth, she never contacted JetBlue about returning to work.  Gratton did not work from February to October 2004, and did not seek any

employment during that time.

In June, Gratton filed a claim with the Vermont Department of Employment and Training for unemployment insurance benefits. The claim was denied on July 22, based on a finding that Gratton had voluntarily chosen not to return to work after a leave of absence.

On July 23, JetBlue sent Gratton an email asking her to call. On July 27, JetBlue sent Gratton another email informing her that she was still considered a CSC, and asking her to call to discuss her status. Gratton asserts that she never received the messages.

At JetBlue, an employee's unreported absence from work for three consecutive days is considered an abandonment of employment and a voluntary resignation from the company. This company policy was contained in the company's book of employee policies, which the plaintiff was required to and did read when she began her employment. Gratton's failure to contact anyone at JetBlue after the birth of her child was considered a voluntary resignation.

On October 19, 2004, T. Rowe Price, the company that JetBlue uses for its retirement services, wrote to Gratton that its records indicated that she had been "terminated" from service with a vested account balance of less than $5,000. It advised her that JetBlue's retirement plan required her to request this balance within 30 days or a check would be mailed to her. The

letter also advised her about tax consequences and her ability to send instructions to roll the vested amount into an IRA. The word "terminated" indicates that Gratton was no longer a JetBlue employee; it did not identify whether she had been fired or resigned.

On September 23, 2004, Gratton filed this action. She served JetBlue on September 30. Gratton amended her complaint on October 18, and again on January 12, 2005. JetBlue moved to dismiss the second amended complaint, but at a conference with the Court on March 11, Gratton requested an opportunity to file yet another amended pleading. Her request was granted, and JetBlue renewed its motion to dismiss. In an Opinion of May 25, 2005, the motion to dismiss Gratton's hostile work environment claim was granted, but its motion to dismiss the disparate treatment and retaliation claims was denied. Gratton v. JetBlue Airways, No. 04 Civ. 7561 (DLC), 2005 WL 1251786 (S.D.N.Y. May 25, 2005). Following the conclusion of discovery, JetBlue filed this motion for summary judgment.

<u>Discussion</u>

Gratton brings two claims under the Pregnancy Discrimination Act of 1978 ("PDA") of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(k). She asserts first that her employment was

unlawfully terminated by JetBlue in February 2004,[3] and second

that JetBlue retaliated against her in October 2004 by again

terminating her employment.

As explained in the Opinion denying in part JetBlue's motion

to dismiss, whose legal discussion is incorporated by reference,

where an employee is temporarily unable to perform the functions

of her job because of her pregnancy-related condition, an

employer must treat her "in the same manner as it treats other

temporarily disabled employees, whether by providing modified

tasks, alternative assignments, disability leaves, leaves without

pay, etc." <u>Gratton</u>, 2005 WL 1251786, at *6 (citation omitted).

Relying on two circuit decisions, Gratton argues that the

comparator need not be a similarly-situated temporarily disabled

employee, but may be any non-pregnant employee. <u>See</u> <u>DiBassie v.</u>

<u>Hirsch & Westheimer, P.C.</u>, No. 00 CV 20203, 2000 WL 1835117, at

*2 (5th Cir. Nov. 27, 2000); <u>Hunt-Golliday v. Metro. Water</u>

<u>Reclamation Dist. of Greater Chicago</u>, 104 F.3d 1004, 1011 (7th

Cir. 1997). These cases did not, however, articulate a different

standard from that identified above. The Seventh Circuit, for

example, noted that the plaintiff in <u>Hunt-Golliday</u> had shown no

evidence that her employer had "failed to treat her just like any

other worker <u>with similar work problems</u> would have been treated."

<u>Hunt-Golliday</u>, 104 F.3d at 1011 (emphasis added); <u>see also</u> <u>id.</u>

---

[3] Although Gratton's brief identifies her claim of
discrimination as based on her age, the substance of her papers
makes it clear that she is asserting a PDA claim.

(noting plaintiff's failure to present comparative evidence relating to "a nonpregnant employee <u>returning from extended sick leave</u>" (emphasis added)).

The standard applied by the Fifth Circuit in <u>Dibassie</u> is admittedly less clear. The court described the fourth element of a <u>prima facie</u> case as requiring a plaintiff to show that "other similarly situated nonpregnant employees were more favorably treated." <u>See</u> <u>Dibassie</u>, 2000 WL 1835117 at *1. The court did not explicitly state that the comparators need be temporarily disabled, and did not mention whether the employees to whom it compared the plaintiff were in fact disabled. <u>Dibassie</u> should not be read to mark any kind of change in the law, however, because it was an unpublished opinion. Under Fifth Circuit rules, an opinion is published if it "[e]stablishes a new rule of law, alters, or modifies an existing rule of law," and an opinion may only go unpublished if all judges on the panel agree that "publication is neither required nor justified under the criteria for publication." 5th Cir. R. 47.5.1(a), 47.5.2. Thus, all of the judges on the <u>Dibassie</u> panel agreed that the opinion in that case did not mark a departure from settled Fifth Circuit precedent, cited in <u>Dibassie</u>, 2000 WL 1835117, at *1, that required comparison to similarly situated temporarily disabled employees. <u>See</u> <u>Urbano v. Cont'l Airlines</u>, 138 F.3d 204, 206 (5th Cir. 1998) (affirming summary judgment for a defendant who treated the plaintiff "in exactly the same manner as it would

have treated any other worker who was injured off the job" and noting that the PDA requires an employer to "treat[] <u>similarly affected</u> but nonpregnant employees the same" as pregnant employees" (emphasis added) (citation omitted)). Both of the courts cited to by Gratton would therefore apply the same standard articulated by this Court in the May 25 Opinion.

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The same standard is applied in employment discrimination cases as in all others. <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 465 (2d Cir. 2000) (citing <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 530 U.S. 133 (2000)). The moving party bears the burden of demonstrating the absence of a material fact question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the movant's pleadings. Rule 56(e), Fed. R. Civ. P.; <u>accord</u> <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).

1.  Unlawful Termination

Claims of disparate treatment under Title VII are analyzed with the burden-shifting approach set forth in <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973).  The plaintiff bears the initial burden of establishing a <u>prima facie</u> case of discrimination.  <u>Williams v. R.H. Donnelly Corp.</u>, 368 F.3d 123, 126 (2d Cir. 2004).  A plaintiff's burden in presenting <u>prima facie</u> evidence of discriminatory treatment is <u>de minimis</u>, <u>Abdu-Brisson</u>, 239 F.3d at 467, but the plaintiff must nonetheless establish that

> (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.

<u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 216 (2d Cir. 2005) (citation omitted).  An inference of discrimination may be raised by "a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group." <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003) (citation omitted).

JetBlue has shown, and Gratton does not contest, that it allows pregnant CSCs to work for as long as they are able to perform all of their job functions, and when they cannot do so or feel that they cannot do so, allows them to take leave until they can return and work without restriction.  Thus, the issue

presented by Gratton's claims is whether JetBlue failed to give Gratton the same opportunity to remain at work that it gave to other employees who temporarily could not perform all of their job functions.

Gratton has not identified any accommodation given to other temporarily disabled employees that was withheld from her. For example, Gratton has not shown that JetBlue ever permitted a temporarily disabled CSC to work exclusively at the ticket counter in the Vermont station -- the position which she asserts it should have offered to her. Similarly, she has presented no evidence that any temporarily disabled CSC was offered the opportunity to work the overtime hours made available to CSCs. Overtime hours were available to CSCs on occasion at the Vermont station in January and February 2004, and Gratton complains that they were not presented to her as employment options.

In fact, Gratton has only identified one comparator who was temporarily disabled: Monica Tardy suffered a shoulder injury and was allowed to check tickets at a checkpoint at the Vermont facility until she recovered. It is undisputed that that accommodation was made in 2001, and that as of 2003 and 2004, the security checkpoint position was staffed by Transportation Security Administration ("TSA") employees and therefore not available as an accommodation for Gratton.

Because she has been unable to find any evidence that JetBlue discriminated against her because she temporarily could

not perform her duties as a CSC, in resisting summary judgment

Gratton has largely abandoned that contention.  Instead, most of

her argument in opposition to this motion is premised on her

contention that she was able fully to perform all of the job

functions of an AO working at the Vermont facility.[4]

There are several hurdles created by this change in her

litigation strategy.  In the first instance, JetBlue cannot be

faulted for accepting the restrictions imposed by Gratton's

personal physician, which forbade her to lift items over 25

pounds (or to work in 100° heat).  Given these restrictions,

Gratton was not qualified to perform the ordinary functions of

either a GO or AO.  Gratton's assertion that, despite her

doctor's written restriction on her duties, she was nonetheless

able to lift as much as 50 pounds is frivolous.  Even if Gratton

had told JetBlue that she didn't want to follow the restrictions

placed upon her by her own doctor, and there is no evidence that

she ever did communicate that position, an employer would have

been courting disaster to ignore the doctor's restrictions.

Another hurdle faced by Gratton is the existence of a

written job description for the AO position that requires an AO

to lift up to 100 pounds.  "[B]eing 'qualified' refers to the

criteria the employer has specified for the position.  Therefore,

in order to establish a prima facie case of discrimination,

[Gratton] must show that she met the defendant's criteria for the

---

[4] Gratton admits that she could not work as a GO.

16

position." <u>Williams</u>, 368 F.3d at 127 (citation omitted).

   To address this obstacle to her claim, she contends that AOs
helped each other in lifting bags, and that since September 11,
2001, TSA employees were in any event the individuals responsible
for lifting passengers' bags at the Vermont station.

   Gratton relies on her own deposition testimony and testimony
from two other deponents to support these factual assertions.
One witness testified that AOs were required to lift heavy bags,
but that she was aware of CSCs assisting others to do so.  A
second, the station manager, testified that the 30-day light work
schedule that JetBlue offered Gratton in Vermont would have
allowed her to work at least part of the time at the ticket
counter, but that JetBlue planned to assign other CSCs to work
there too to assist her in lifting bags.  In giving this
testimony, the manager admitted that CSCs help each other out if
someone needs assistance.  The manager also testified that TSA
employees began working at the Vermont facility sometime between
2002 and 2003, and that they placed a bag on the luggage conveyor
belt after a CSC had given the bag to them.  Finally, the
plaintiff testified that while it had been part of her regular
duties in Vermont to lift bags before her relocation to Tampa,
after the TSA employees arrived, they were stationed about four
feet behind the customer service counter.

   The evidence offered by Gratton does not raise a question of
fact as to whether it was an essential part of the duties of AOs

17

not only on paper but also in practice to be able to lift heavy bags.  First, JetBlue was not required to ignore its written job description and rely on Gratton's co-workers to help her out informally because she could not perform her regular job duties. Moreover, while the evidence she offers indicates that TSA employees also lifted the bags, it does not show that after the arrival of TSA employees at the Vermont airport AOs were no longer required to do so.  To the contrary, the deposition passages she cites indicate that the TSA employees handled bags given to them by AOs and that if Gratton had taken one of the 30-day soft-work assignments JetBlue offered to her upon her return to Vermont, that the defendant planned as an accommodation to Gratton to have a second AO at the ticket counter in order to lift bags.  As a consequence, Gratton has not raised a triable issue of fact as to whether she was qualified to perform the regular duties of an AO after she returned to Vermont in the Fall of 2003.

The parties also dispute whether JetBlue terminated Gratton's employment in February 2004, or whether she abandoned her job.  Gratton contends that she reasonably believed that she had lost her job because JetBlue forced her to take an extended pregnancy leave by not allowing her to work exclusively as an AO at the Vermont facility, by not offering a 30-day work alternative that was attractive to her, and by not allowing her to take the overtime work opportunities that became available to

regular CSCs in January and early February 2004. She further
contends that she properly assumed that she had lost her job when
JetBlue rejected her FMLA medical leave request and failed to
return her call inquiring about the rejection of this paperwork.[5]
She denies that she received emails from JetBlue following the
birth of her child inquiring if she planned to return. For this
reason, she argues it was reasonable for her to believe that
"JetBlue terminated her position in February 2004."

JetBlue has shown that Gratton abandoned her job. Gratton's
efforts to raise an issue of fact on this score fail. Gratton
admits that the manager of the Vermont station told her to report
back for work six weeks after the birth of her child and that she
never contacted JetBlue to make arrangements to return after her
child was born. Her unhappiness about the restricted duty
options offered to her during her pregnancy do not provide a
reasonable basis for her to conclude that once her doctor lifted
the  restrictions that affected her ability to work as a CSC,
that JetBlue would not have allowed her to resume her employment.
Similarly, the way the JetBlue benefits department handled her
FMLA paperwork does not provide a reasonable basis for a belief

---

[5] JetBlue contends that it authorized Gratton to take leave
extending until six weeks after she gave birth or roughly four
months of leave, even though she was in all likelihood ineligible
for FMLA leave because she had not worked 1,250 hours in the 12
preceding months, and had not worked at all since September 2003.
Moreover, the only written evidence of a rejection of her FMLA
leave request comes from March 2004, a month after Gratton
contends she came to understand she had lost her job.

that she had been fired.

In sum, Gratton has failed to present sufficient evidence to establish that she was competent to perform the duties of a CSC, or that she was fired in February 2004, much less that JetBlue discriminated against her because of her pregnancy by firing her. Even if she could carry her minimal burden of establishing a prima facie case of discrimination, she has failed to raise a question of fact as to whether JetBlue treated her less favorably than any other temporarily disabled employee. Summary judgment will be granted to the defendant on the discrimination claim.

2. Retaliation

Retaliation claims are, like other Title VII claims, evaluated under the three-step burden shifting analysis. <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998). First, the plaintiff must make out a prima facie case; second, the defendant must articulate a non-retaliatory reason for the action; third, if the defendant meets its burden, plaintiff must produce evidence sufficient to raise a question of fact as to whether the employer's proffered reason was mere pretext for retaliation. <u>Id.</u> at 768-69. In order to establish a prima facie case of retaliation, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse

employment action." <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005) (citation omitted).

Gratton contends that she was first informed by JetBlue that it had terminated her employment when T. Rowe Price sent the October 19 letter about her pension money.  She asserts that this letter reflected the decision to fire her, and that that decision had been made in retaliation for her filing the charge of discrimination with the EEOC in March 2004 and her federal lawsuit in September 2004.

If the plaintiff were correct that JetBlue fired her in February 2004, and that she did not abandon her job, then the claim of retaliation would have to be dismissed since the decision reflected in the October letter is attributable to the February decision and not complaints of discrimination that she made in March and September.  On the other hand, if Gratton was not fired and simply abandoned her job, then she cannot prevail on the retaliation claim since it is undisputed that JetBlue may terminate the employment of an individual who abandons her employment.  Either way, the claim could not survive.

As already explained, JetBlue has established that Gratton abandoned her job, and Gratton has failed to show that she is entitled to a trial on that issue.  As a result, advising her about the impact of the termination of her employment on her pension benefits cannot be construed as an act of retaliation.

## Conclusion

JetBlue's motion for summary judgment is granted. The Clerk of Court shall enter judgment for the defendant and close the case.


SO ORDERED:
Dated:     New York, New York
           July 21, 2006

_____
                DENISE COTE
        United States District Judge